FILED
2012 Nov-02  PM 03:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN  DIVISION

| | | |
|---|---|---|
| **RODNEY BLANCHARD,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| **v.** | ] | |
| | ] | |
| **CITY OF BIRMINGHAM, et. al.,** | ] | **CV-10-BE-2250-S** |
| | ] | |
| **Defendants.** | ] | |
| | ] | |
| | ] | |

## MEMORANDUM OPINION

This matter, asserting constitutional violations based on the alleged use of excessive force and false arrest and brought pursuant to 42 U.S.C. § 1983, is before the court on two motions: "Defendant City of Birmingham's Motion for Judgment on the Pleadings or, Alternatively, Motion for Summary Judgment" (doc. 73); and  "Defendant's Motion to Strike Legal Arguments Regarding Chief AC Roper in Plaintiff's Response to Defendant's Motion for Summary Judgment" (doc. 94).  For the reasons stated in this Memorandum Opinion, the court FINDS that the Motion to Strike is due to be GRANTED in part and DENIED in part; that the Motion for Judgment on the Pleadings is due to be DENIED; and that the alternative Motion for Summary Judgment is due to be DENIED.

## I.  PROCEDURAL HISTORY

On August 19, 2010, Rodney Blanchard filed this action alleging the following claims: Count I - pursuant to 42 U.S.C. §1983, asserting that Defendant Corey Hooper's use of excessive force against Blanchard, in accordance with Defendant City of Birmingham's alleged pattern and

practice allowing or ratifying the use of excessive force, violated Blanchard's constitutional rights under the Fourth and Fourteenth Amendments; Count II - pursuant to 42 U.S.C. §1983, asserting that Defendant Hooper arrested Blanchard without probable cause in violation of Blanchard's constitutional rights under the Fourth and Fourteenth Amendments; Count III - asserting claims under Alabama state law against Defendants for assault and battery/excessive force; and Count IV - asserting claims under Alabama state law against Defendants for false arrest/false imprisonment.  The City filed an Answer on August 30, 2010 (doc. 4) and Hoooper filed an Answer on February 24, 2011 (doc. 12).  Based on an agreement between the parties, Blanchard filed a motion to voluntarily dismiss Counts III and IV (doc. 90), and the court granted the motion (doc. 96), dismissing Counts III and IV pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure.

On June 12, 2012, the City filed a motion for judgment on the pleadings, and alternatively, for summary judgment.  (Doc. 73).  That motion received thorough briefing. Because Counts III and IV have been dismissed and because Count II is asserted against Defendant Hooper only, this dispositive motion only addresses the claims asserted in Count I against the City of Birmingham.  On July 20, 2012, the City filed a motion to strike (doc. 94) the legal arguments regarding Chief Roper in Blanchard's responsive brief.

## II.  FACTS

A. *The Incident Made the Basis of this Suit*

On December 3, 2009, Defendant Hooper, a Birmingham police officer, called Blanchard to come to the Police Administration Building to "talk."  Blanchard asked Hooper whether he needed to bring an attorney with him for the discussion, and Hooper said, "No, you don't.  We're

2

just talking." After Hooper arrived at the building, Hooper took Blanchard into a conference

room and began asking Blanchard questions regarding an ongoing burglary investigation,

accusing Blanchard of being involved. Hooper did not obtain from Blanchard a signed waiver of

*Miranda* rights at any point during the visit.

When Blanchard did not agree that he was involved in the burglary, Hooper said, "You

can either have a $100,000 bond, or you can go and sign yourself out if you want to just tell the

truth." Blanchard responded, "Why don't you just let me go ahead and get my lawyer and come

back down here?" However, Hooper said, "No," and then told Blanchard to stand up because he

was going to jail. Blanchard complied and stood up and put his hands behind him.

What happened next is in dispute. According to Blanchard, Hooper bent Blanchard over

the table, slamming Blanchard's head against that table, and then Hooper lifted him up from

behind and threw him to the ground, slamming Blanchard's head against the floor. Hooper

denies that he slammed Blanchard's head into the table or floor.

Catherine Guin, a secretary working on the floor, heard Detective Hooper "talking

loudly" and went into the conference room. Recognizing that the situation was heated, Guin took

Hooper out of the room and walked him down the hall. Hooper then filled out a form to detain

Blanchard – but not arrest him – for an additional forty-eight hours. The form to secure the

extension required a judge's signature, so Hooper signed the name of a judge, turned in the form

to Officer Oldham, and Officer Oldham took Blanchard to the City jail. Upon Blanchard's being

taken to the jail, Blanchard complained about the alleged beating, and the Birmingham Police

Department Nurse completed Blanchard's Medical Information Record indicating that Blanchard

was "sent to the hospital at time of booking due to c/o [complaining of] being hit by Detective."

3

When Blanchard arrived at Cooper Green Hospital on December 3, 2009, his medical records indicate that he was in the following condition: "Contusions to the head; Evidence of injury; Blood in his ear canal; Decreased hearing in his right ear; Hemotympanum in his right ear."

Guin later talked to Sergeant Thomas, Hooper's supervisor, about the incident between Blanchard and Hooper. Despite Guin's communication with Sergeant Thomas and Blanchard's complaints at the jail in his Medical Information Record, the Birmingham Police Department did not notify the Internal Affairs Division ("IAD") or otherwise initiate an IAD investigation regarding Hooper's alleged beating of Blanchard. Although, as noted, Blanchard complained about the alleged beating at the time he was taken to the jail, he did not file with IAD a separate complaint against Hooper or any Birmingham Police Officer alleging excessive force or injuries. When Chief Roper gave his affidavit in June of 2012, Roper testified that he had no knowledge of the December 2009 incident between Blanchard and Hooper or of Blanchard's complaints of mistreatment by any Birmingham police officer.

On December 4, 2009, the day after the incident between Hooper and Blanchard in the conference room, Hooper released Blanchard from jail before the forty-eight hours had elapsed and did not charge Blanchard with any crime at that time.

On August 19, 2010, Blanchard filed this case, alleging, among other matters, that Hooper used excessive force against him on December 3, 2009 and that, based on that excessive force, the City violated Blanchard's constitutional rights. IAD was not notified of Blanchard's suit against the City and Hooper, and Lieutenant Shepard, the Commander of Birmingham's IAD did not know that Blanchard had filed a suit against the City and a Birmingham police officer for

4

excessive force until he received a deposition notice in December of 2011, two years after the incident.

On February 28, 2011, four days after Hooper filed his Answer to Blanchard's Complaint, the Birmingham Police Department arrested Blanchard for the alleged burglary about which Hooper questioned him in December 2009,[1] and Blanchard pleaded guilty to the charge.

### B. Birmingham Police Department Training and Rules

The affidavit of Chief Roper provides some general information about the City's training of police officers. The Alabama Police Officer Standards and Training Commission ("APOST"), an entity created by the Alabama legislature, "sets the minimum standards for the qualifications and training for all police officers in the state." While APOST minimum standards require 480 hours of academy training on required subjects, the Birmingham Police Academy curriculum provides over 800 hours. The training includes arrest and detention standards and Use of Force standards. The Birmingham Police Department also supplies to officer trainees a thick volume of the Birmingham Police Department Rules and Regulations containing the procedures to be followed by officers. Following graduation from the Police Academy, each new Birmingham officer is assigned to a Field Training Officer ("FTO") for a 16-week course of instruction, and the FTO evaluates each new officer. In addition to this training, officers must undergo twice-

---

[1] The court notes that when the Plaintiff asked the City in Plaintiff's Undisputed Fact 24 to admit the date Blanchard was arrested and that the charge for which he was arrested was the burglary about which he was questioned on December 4, 2009 – facts certainly available to the City – the City refused to admit those facts. Rather, the City responded, "The Defendants cannot admit or deny as there is no evidence presented by Plaintiff to support such statement." (Doc. 93, at 3). Given the circumstances, the City's response is disingenuous, and the court does not appreciate such gamesmanship from the City's counsel. For the purposes of this motion, the court considers those facts to be undisputed pursuant to Rule 56(e)(2).

yearly firing range qualification and roll-call training, which is specialized training in some area

of law enforcement performed thirty minutes prior to shifts,

Chief Roper also stated in his affidavit that the Commission for Accreditation of Law

Enforcement Agencies ("CALEA"), which sets standards for law enforcement agencies

throughout the nation, has consistently accredited the Birmingham Police Department since the

1980s, and, as part of that accreditation process, the police department must show the

commission's auditors that the Department has met its standards.

Although Chief Roper provided this general information regarding training and

accreditation, he provided in his affidavit only one Birmingham Police Department policy or

practice: that "[i]f any citizen alleges mistreatment (verbal or physical) or even discourteousness,

the complaint is investigated by the Internal Affairs Division.  If proven true the offending police

officer(s) are disciplined."

The facts that Blanchard presented in his brief include more specific information about

Birmingham Police Department policies, rules and regulations.  Section 110-1 of the

Birmingham Police Department Rules provides as follows:

> **III. <u>SCOPE OF THIS PROCEDURE</u>**
> **A.** All alleged or suspected violations of laws, ordinances, Personnel Board
> Rules and Regulations, Department Rules and Regulations, orders or
> misconduct by employees of the Police Department, must be investigated.
> **B.**  The incidents include, but are not all inclusive:
> > **1.**  Those violations observed or suspected by supervisory or
> > commanding officers.
> > **2.** Those violations reported orally or in writing by employees of the
> > Department to Supervisory or Commanding Officers.
> > **3.**  Those violations reported by a citizen (including prisoners) in
> > person, by telephone, or by correspondence.  Where possible, these
> > complaints should be signed by the complainant.

IV.    **AUTHORITY AND RESPONSIBILITY TO CONDUCT INVESTIGATIONS**
      A.    **Individual Responsibility**

> Upon initiation of such investigation, said Commanding Officer must notify the Commanding Officer of the Internal Affairs Division or his representative as soon as practical.

(Doc. 92-6, Exhibit E).

However,  Lieutenant Shepard of the Birmingham Police Department testified that the *practice* of the Birmingham Police Department is not to begin an investigation unless and until an individual or a Department officer files a formal 131 IAD complaint.  Even the filing of a federal lawsuit is not necessarily sufficient to initiate an IAD investigation in the absence of a formal IAD complaint; as noted previously, Shepard was unaware of the present lawsuit until he received a deposition notice two years after Blanchard filed suit.

As also noted, the Department is accredited by CALEA, and CALEA standard 35.1.2 requires that every full-time employee be evaluated annually.  During the assessment periods for 2007, 2008, and 2009, the Birmingham Police Department did not complete any employee evaluations, because the City was in the midst of litigation with the Jefferson County Personnel Board regarding performance evaluation processes.

Birmingham Police Department Rules and Regulations mandate that when force is used against an individual, all officers involved must complete a Use of Force Report.  According to the facts presented, during the reporting period of January 1, 2007 through February 1, 2012, Birmingham Police Officers completed 2,449[2] Use of Force Reports, and of those reports, 2,366

---

[2] The court acknowledges that these numbers add up to 2,439 instead of 2,449, but the court is unsure where the error lies.  These numbers were presented in Blanchard's undisputed fact section as fact number 38, and the City admitted that fact.

were found "in policy," 72 had no finding, and only one was "sustained." The Department investigated 203 complaints of excessive force during the five years from January 1, 2007 to January 1, 2012— approximately forty complaints per year.

*C. Notice*

Blanchard asserts that the City and BPD were on notice prior to December 3, 2009 that the Department had a need for training and supervision of officers, such as Hooper, regarding Use of Force and reporting and disciplining officers for applying excessive force.

*Notice of Use of Force Problems with Corey Hooper Prior to December of 2009*

Hooper has had a total of seventeen formal IAD allegations filed against him, only four or five of which were "sustained" after IAD review. The last three sustained allegations occurred in 2007. The Birmingham Police Department disciplined Hooper for unspecified conduct, imposing leave without pay, for an incident that occurred on March 8, 2007. Further, the Department found that on August 4, 2007 Hooper failed to use proper procedure when he tased a suspect named Cooper, who was in custody, hand cuffed, and not resisting arrest or otherwise posing a threat. The August 2007 incident was preserved on videotape, and Hooper received discipline of fifteen days "PWOP." When referring to his tasering of Cooper, Hooper acknowledged to his supervisors at the scene about his "unfamiliarity with the appropriate levels of force."

On September 6, 2007, thirty-one days after Hooper tasered Cooper, another incident occurred involving Hooper and alleged excessive force: Hooper physically removed Gulley, a handcuffed individual, from the backseat of another officer's patrol car and punched him in the face approximately five times. Hooper received a fifteen-day suspension for the incident with

Gulley, and the Referral for Employee Assistance Program recommended that Hooper be evaluated for fitness of duty and for possible anger management classes.  However, Hooper does not recall attending any remedial classes after the suspension.  The Department did not investigate Hooper's incident with Cooper until after Gulley's beating.

Birmingham Police Department records reflect that during the year 2007, Hooper had nine Use of Force Allegations made against him.  The record does not state what Department rules and regulations mandate about the minimum number of Use of Force allegations made against an officer within a 365-day period that would trigger a supervisor's review.  However, the City admits that Hooper's supervisor should have placed some type of documents or notations in Hooper's file saying that a review had been conducted as to why he had nine Use of Force allegations within 365 days, and further admits that Hooper's file contains no documentation that Hooper's supervisor ever conducted such a review.

Within one year of his 2007 discipline, Hooper became a burglary detective.

*Notice Prior to December of 2009 within the BPD Regarding Use of Force Problems and Problems with Lack of Reporting & Disciplining Officers for Excessive Force*

Evidence exists that in 2008, the Birmingham Police Department had an incident with allegations involving numerous police officers' use of excessive force. That videotaped incident involved officers beating Anthony Warren while he was unconscious, lying prone in a ditch. Although fifteen Birmingham Police Department officers were on the scene of the beating, including lieutenants, sergeants, and at least one captain, and ten supervisors viewed the videotape of the beating, no Birmingham Police Department officer issued a written report documenting the beating, nor did the Department suspend any supervisors or permanently discharge any officers as a result of the incident.

9

After the videotape of the Warren beating came to light in January of 2009 and received intense media coverage, Chief Roper conducted a staff meeting[3] with most of the senior staff - the Captains, the Unit Commanders and the Deputy Chiefs – in which he stated that certain Department procedures had not been followed in the Warren incident: he acknowledged problems with the notifications and documentation of the incident and with supervision to ensure that notifications and documentation of the incident were submitted to the appropriate officials. In responding to Blanchard's Statement of Undisputed Facts, the City admitted the following fact: "Chief Roper acknowledged in mid 2009, that in order to do a better job of making sure the policies are followed, the department should 1) reiterate the policy through training or information; 2) ensure that the supervisors fully understand the policy and 3) make sure that the policies - that there's accountability regarding the policies. Appropriate discipline action needs to be conducted." The citation for that fact was Chief Roper's deposition addressing the Warren incident and the context of the "policies" Roper discussed involved policies about Use of Force, policies of reporting when allegations are raised of improper Use of Force, and policies of conducting discipline when officers do not follow the policies regarding Use of Force and Use of Force reporting.

Eventually, IAD conducted an investigation of the Warren incident and sustained seventeen cases of procedure violations as well as five cases of improper Use of Force.

### III.  MOTION TO STRIKE

In this motion (doc. 94), the City requests that this court strike certain legal arguments and references to Police Chief A.C. Roper.  The court does acknowledge that on four pages of

---

[3] The record does not state the exact date of this staff meeting.

Blanchard's brief, he erroneously refers to Chief Roper as a Defendant, and Chief Roper is *not* a Defendant in this case.  Although the court is certainly capable of ignoring the erroneous title of "Defendant" in references to Chief Roper, if the City insists on correcting those errors in public documents filed online, the court will GRANT the motion to the extent that it calls for the striking of the word "Defendant" in connection with Chief Roper.  Therefore, it will STRIKE the word "Defendant" in document 77 in the following places: (1) page 17 under section  C. in heading "i". between the word "and" and the word "Chief"; (2) page 18 in heading "ii" between the word "and" and the word "chief" and under heading "ii," first word in the second sentence before the word "Roper"; (3) page 19, first full paragraph, second sentence between the word "event" and the word "Roper"; (4) page 30 in heading "iii" between the word "and" and the word "Roper."  Further, it will DIRECT the clerk of the court to place a note in the docket entry to document 77 that the court has stricken all erroneous references to "Defendant Roper" in that document.

However, the court will DENY the motion to the extent that it requests that the legal arguments be stricken referencing Chief A.C. Roper's training and supervising of officers such as Defendant Hooper**,** and his setting of policies and customs of the City regarding appropriate force and discipline for using excessive force.  Although Chief Roper is not a Defendant in this case, the City is a Defendant, and because Chief Roper, as Chief of Police, is involved in setting policies and customs for the City's police force, the court will not strike legal arguments referencing Chief Roper when discussing such matters.

## IV. MOTION FOR JUDGMENT ON THE PLEADINGS AND ALTERNATIVE MOTION FOR SUMMARY JUDGMENT

Because both parties submitted materials outside the pleadings, the court will DENY the motion for judgment on the pleadings, will treat the motion as one for summary judgment, and thus, will address the alternative motion.  *See* Fed. R. Civ. P. 12(d); *see also Andrx Pharm., Inc. v. Elan Corp.*, 421 F.3d 1227, 1232-33 (11th Cir. 2005) ("Judgment on the pleadings is proper when no issues of material fact exist, and the moving party is entitled to judgment as a matter of law based on the substance of the pleadings and any judicially noticed facts.")

### A.  Summary Judgment Standard

Summary judgment is an integral part of the Federal Rules of Civil Procedure.  Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law.  S*ee* Fed. R. Civ. P. 56.  When a district court reviews a motion for summary judgment it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof.  *Celotex*, 477 U.S. at 322-23.  Rule 56, however, does not require "that the moving party support

12

its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.*   If the moving party does not meet its burden, the court must deny the motion for summary judgment.

**B.  Discussion**

Count I of the Complaint is the only remaining count that asserts claims against the City and that the motion for summary judgment thus addresses.  In that count,  Blanchard claims that the City violated Blanchard's constitutional rights by having a policy and custom where Birmingham police officers applied excessive force.  Further, Blanchard claims in Count I that, prior to the incident involving Blanchard, that the City permitted, encouraged and ratified a pattern and practice of the police officers' use of excessive force by failing to investigate complaints of excessive force and by failing to discipline or prosecute known incidents of officer misconduct, including excessive force.  In the summary judgment briefs, both parties address  the federal claim against the City as one focused on its alleged failure to train and supervise officers regarding Use of Force and related issues of reporting Use of Force complaints and discipline for Use of Force abuses.

A municipality is liable under 42 U.S.C. § 1983 only if the municipality *"itself* caused the constitutional violation at issue; it cannot be found liable on a vicarious liability theory." *Skop v. City of Atlanta, Ga.,* 485 F.3d 1130, 1145 (11th Cir. 2007).  Thus, a city may be subject to such liability only when the plaintiff establishes that (1) a municipal policy or custom (2) causes (3) a violation of plaintiff's constitutional rights.  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). A city policy or custom may include a failure to provide adequate training if that "failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants." *Id.* at 389.

13

The Eleventh Circuit Court of Appeals has explained that "[t]o establish a city's deliberate indifference, 'a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action.'" *Lewis v. City of West Palm Beach, Fla.,* 561 F.3d 1288, 1293 (11th Cir. 2009) (quoting *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998)).  The plaintiff may establish the city's notice, and thus, deliberate indifference, in two ways: (1) by providing evidence that "the city is aware that a pattern of constitutional violations exists, and nevertheless fails to provide adequate training"; or alternatively (2) by establishing, without evidence of prior incidents, that "the likelihood for constitutional violation is so high that the need for training would be obvious."  *Lewis*, 561 F.3d at 1293.  The Supreme Court and the Eleventh Circuit have treated failure to train cases the same as failure to supervise cases, applying the same standard. *See City of Canton*, 489 U.S. at 387; *Gold*, 151 F.3d at 1350.

The Supreme Court has explained that, in addressing and resolving the failure to train issue, a court must focus "on adequacy of the training program in relation to the tasks the particular officers must perform." *City of Canton*, 489 U.S. at 391.  Because the deficiency in the training of one officer may result "from factors other than a faulty training program," the Supreme Court stated that focusing on any inadequate training of particular officers "will not alone suffice to fasten liability on the city." *Id.*  Rather, liability would attach if the deficiency was in the city's training program and if that deficiency is "closely related to the ultimate injury." *Id.*

In the instant case, Blanchard relies on the first means of establishing deliberate indifference: he alleges that the City was aware of a pattern of constitutional violations but

14

nevertheless failed to provide adequate training and/or supervision.  Blanchard has produced

evidence of the City's notice, as Chief Roper acknowledged in mid-2009, of a general,

department-wide need for officer training and supervision on Use of Force and related reporting

and discipline issues.  Indeed, after the intense media coverage in 2009 of the Anthony Warren

incident, involving inappropriate Use of Force and a failure in reporting and accountability for

that inappropriate Use of Force, the City cannot successfully argue no evidence exists that it had

notice of a need for training and supervision in this area.  Further, Blanchard has produced

evidence that the City failed to provide such training and supervision to officers such as Hooper

and his supervisors after that notice of need and before the Blanchard incident in December of

2009.

> The court finds that Blanchard has produced evidence that, if believed, could establish the

City's deliberate indifference to the need to train and supervise Department officers, including

Hooper, and would be sufficient to establish a custom and policy of constitutional violations on

the part of the City.  Further, because that custom and policy regarded excessive force and related

issues of reporting and discipline in place before Blanchard's December 2009 incident,

Blanchard has produced evidence that, if believed, was closely related to the ultimate injury and

could establish that the City's policy or custom *caused* the violation of Blanchard's constitutional

rights.  The court finds that genuine issues of material fact exist and that the City has not

established its entitlement to judgment as a matter of law.

> Therefore, the court FINDS that the City's motion for summary judgment is due to be

DENIED as to the claims in Count I.

Dated this 2nd day of November, 2012.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE